UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 14-cv-836 (RJS)

K.C. ON BEHALF OF C.R.,

Plaintiff,

VERSUS

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

OPINION AND ORDER
March 30, 2015

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/9/15

RICHARD J. SULLIVAN, District Judge:

Plaintiff K.C., on behalf of her minor son, C.R., brings this action against the New York City Department of Education ("Defendant" or "DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"). Specifically, Plaintiff asserts that DOE failed to provide a fair and appropriate public education for C.R. and seeks reimbursement for the cost of her son's enrollment at the Cooke Center Grammar School ("Cooke Center"), where she unilaterally enrolled C.R. for the 2012–2013 school year. Before the Court are the parties' cross motions for summary judgment. For the reasons that follow, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED.

I. BACKGROUND

A. Statutory Framework

The IDEA requires states benefiting from federal funds to provide a "free appropriate public education" to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Under the statute, a free appropriate public education ("FAPE") must offer "'special education and related services' tailored to meet the unique needs of a particular child" and "'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

The special education and related services required by the IDEA are provided to students based on an individualized education program ("IEP"), which school districts must provide annually. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988). A "team" consisting of the child's parents, teachers, representatives of the local educational agency and, where appropriate, the child, meets for the purpose of crafting the IEP. 20 U.S.C. § 1414(d)(1)(B). In New York, this IEP team is called the Committee on Special Education ("CSE"), and a DOE representative serves as the CSE team leader. *See* N.Y. Educ. Law § 4402(1)(b)(1). To the extent the members of the CSE team disagree, the DOE representative's determination prevails at this stage. *See M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 132 (S.D.N.Y. 2010).

The IDEA also establishes "procedural safeguards" to ensure that students with disabilities receive a FAPE. 20 U.S.C. § 1415(a). Specifically, the law requires that states provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). To adjudicate parent's complaints, New York has implemented a two-tiered system of administrative review. N.Y. Educ. Law § 4404. Under the first tier, parents dissatisfied with a proposed IEP may seek review by an impartial hearing officer ("IHO"). *Id.* § 4404(1). Following the decision of the IHO, an aggrieved party may appeal to a state review officer ("SRO"). *Id.* § 4404(2). After exhausting this two-step administrative process, any party still aggrieved may bring a civil action challenging the decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Additionally, pursuant to the IDEA's procedural safeguards, parents dissatisfied with an educational placement provided by a school district may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with the state educational agency seeking reimbursement for the private school tuition. *See Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). A school district must reimburse parents for unilaterally selected educational services if the parents can establish that: (i) the educational program recommended in the IEP was inappropriate to meet the child's needs; (ii) the alternative placement or additional services selected by the parents were appropriate; and (iii) equitable factors weigh in favor of reimbursement. *See R.B. v. New York City Dep't of Educ.*, 713 F. Supp. 2d 235, 238 (S.D.N.Y. 2010) (citing *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009)). Parents seeking reimbursement for a unilateral private placement bear the burden of proving that the private placement was appropriate. *Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005); N.Y. Educ. Law § 4404(1)(c). Thus, parents who believe that the state has failed to offer their child a FAPE act "at

their own financial risk" when choosing to enroll their child in a private school. *A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (citation omitted).

### B. Facts[1]

C.R., a student with Autism Spectrum Disorder, began fourth grade during the 2012–2013 school year. (JA 217, 733.) From a young age, C.R. exhibited developmental delays and self-harming behaviors. Specifically, C.R. required extensive repetition in order to understand ideas, became distracted easily, and occasionally banged his head against objects. He attended preschool at the YAI Gramercy School for children with special needs until he was five years old, during which time his communication skills improved. (JA 328–29.) In 2008, C.R. transitioned to Kindergarten at P.S. 36, a public school. C.R. was consistently upset in the public school environment, and he became reluctant to attend school. (JA 329–31.)

Concerned by her son's behavior, K.C. consulted Dr. Agnes Whitaker, a child psychiatrist with Columbia University Medical Center, in September 2010. Dr. Whitaker diagnosed C.R. with Autism Spectrum Disorder and recommended placement in a "specialized school for children with specialized needs, such as the Cooke Center." (JA 213–14, 217, 331, 468–69.) C.R. enrolled at the Cooke Center for the 2010 and 2011 school years at DOE's expense. (JA 24, 343.) His classroom included 12 students, 2 teachers, and 2 paraprofessionals, and the Cooke Center teaching team provided frequent small-group and individual instruction. (JA 302–03.) C.R. also received related services, including occupational and speech therapy, as part of the Cooke Center curriculum. (JA 661.) During this period, C.R. progressed academically. (JA 333.)

### 1. CSE Meeting

On August 23, 2012, the CSE conducted an annual review to discuss C.R.'s progress and recommend an IEP for his upcoming fourth-grade year. (JA 745.) Derrick Townsend, a former general education and special education teacher, served as the District Representative for DOE and CSE team leader, and he appeared along with a DOE psychologist. (JA 745, 150–51.) K.C. took part in the meeting, along with her attorney, after receiving notice that she and those knowledgeable about C.R. should attend. (JA 745.) During the CSE meeting, the team discussed C.R.'s upcoming school year with an emphasis on the prior year's IEP and on a June 2012 educational progress report completed by educators at the Cooke Center. (JA 153, 519–34, 577–97.) The prior IEP included C.R.'s strengths and weaknesses in different areas of academic and emotional development. It also set out goals for the academic year and recommended related services, including counseling, occupational therapy, and

---

[1] The following facts are drawn principally from the parties' joint appendix and supplemental record materials, filed under seal. (Doc. No. 18 ("JA"), 21, 27.) In deciding the parties' instant cross-motions for summary judgment, the Court has also considered Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem."), Defendant's Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem."), Plaintiff's Reply ("Pl. Reply"), Defendant's Reply ("Def. Reply"), and the documents submitted in support thereof. (Doc. Nos. 15–16, 19–20, 22–23, 26.)

speech/language therapy. (JA 519–34.) The Cooke Center report was similarly detailed, reviewing both C.R.'s academic performance levels and needs and relaying reports from his related service providers. (JA 577–97.) Additionally, at the meeting, the CSE team discussed the type, frequency, duration, and group size for each of the related services indicated on the prior year's IEP and in the Cooke Center report. (JA 161–63, 173–74, 335, 534.) None of the parties present objected to continuing these services into the 2012–2013 school year. (JA 167–68.)

During the meeting, Mr. Townsend frequently consulted K.C. on a range of topics. K.C. requested that C.R. not be placed with emotionally disturbed classmates. (JA 334–35.) On several occasions, she deferred to the opinion of the Cooke Center staff regarding C.R.'s educational program. (*Id.*) At no time did K.C. or her attorney seek an adjournment so that teachers or others from the Cooke Center could participate in the meeting.

At the session's conclusion, Mr. Townsend, on behalf of DOE, recommended a ten-month placement in a 12:1:1 class – comprised of twelve students, one special education teacher, and one paraprofessional trained to address physical and emotional issues – in a community school. (JA 179–80, 740, 743.) DOE also recommended several sessions each week in occupational therapy, speech/language therapy, and counseling. (JA 162–63, 729, 730.) These related service programs and their frequencies were not memorialized in the designated section of C.R.'s 2012 IEP, dated August 23, 2012, as required by law. (JA 741, 745.) Rather, they appeared in several internal DOE documents, including a review agenda for the CSE meeting, Mr. Townsend's handwritten notes, the CSE meeting minutes, and the conference result form. (JA 196–98, 729, 732; Declaration of Neil Giovanatti, dated June 13, 2014, Doc. No. 21, Ex. A ("Townsend Notes"); Letter from Neil Giovanatti, dated March 17, 2015, Doc. No. 27, Ex. A ("Meeting Minutes").)

On August 28, 2012, DOE issued a Final Notice of Recommendation offering C.R. placement in a 12:1:1 class at P.S. 129 ("P.S. 129 Center"). (JA 618.) The document further indicated that C.R. would receive related services in occupational therapy, speech, and counseling, but it did not detail the frequency, duration, or group size associated with each activity. (*Id.*) K.C. phoned P.S. 129 Center and scheduled a visit for late September 2012. (JA 337–38.) She toured the facility along with her husband and returned the following month for a second visit accompanied by both a representative from the Cooke Center and her attorney. (JA 230, 345–46, 348.) On November 14, 2012, K.C. formally rejected DOE's recommended placement, noting the IEP's lack of specific related service recommendations. (JA 635–37.) By that time, C.R. had been enrolled at the Cooke Center since August 2012, and K.C. informed DOE that C.R. would remain there for the rest of the 2012–2013 school year. (JA 635–37, 643, 746–47.)

On February 22, 2013, K.C. filed a Due Process Complaint with DOE seeking reimbursement for C.R.'s $45,000 Cooke Center tuition for the 2012–2013 school year. (JA 641–44.) Specifically, she alleged that (1) the CSE meeting occurred without a representative of the Cooke Center being present, (2) the resulting IEP did not include specific references to related services, (3)

4

the IEP was inappropriate for C.R., and (4) the recommended placement was inappropriate for C.R. (JA 642–43.)

2. IHO Hearing

After an initial status conference in April 2013, the parties commenced an IHO Hearing on May 24, 2013. (JA 21.) The Hearing Officer received testimony from several individuals, including members of the CSE team.

At the hearing, Mr. Townsend admitted that he had mistakenly omitted the related service recommendations discussed at the CSE meeting from C.R.'s 2012 IEP, but he maintained that those recommendations appeared in multiple internal DOE documents. (JA 163–67, 173.) He further stated that, while no Cooke Center representative was present at the CSE meeting, the Cooke Center progress reports provided detailed information regarding C.R. Indeed, much of the IEP that CSE generated incorporated the Cooke Center recommendations. (JA 170, 177–78, 182.)

Dr. Whitaker also testified at the hearing and described her recommendation that C.R. receive a placement in a specialized school like the Cooke Center. (JA 216.) She explained that C.R. required "a small structured classroom with a high teacher to student ratio . . . where his sensory sensitivities [could] be accommodated." (JA 222.)

Ms. Tuttle, a school psychologist at the Cooke Center, also testified, recounting her September visit to C.R.'s recommended placement at P.S. 129 Center. Though she did not view the classroom, she spoke with the 12:1:1 fourth-grade teacher and learned that the class included students with emotional disturbances. (JA 231–32.) She further noted that there was considerable noise in the hallways at P.S. 129 Center. (JA 234.) Other representatives from the Cooke Center also testified, including C.R.'s classroom teacher, Ms. Shah. (JA 296.)

Finally, K.C. took the stand. She stated that she had repeatedly voiced her concern that the CSE meeting occurred without a Cooke Center representative and that she was not then aware of her ability to request another meeting time for C.R.'s annual review, notwithstanding the fact that she was represented by counsel and had received notice of the ability to postpone. (JA 334–35, 344, 725.) She further explained that her experiences during visits to P.S. 129 Center led her to reject the placement based on its size, noise level, and potential to cause regression. (JA 339, 354.)

The IHO issued its written opinion on July 11, 2013. (JA 43.) It found that DOE's failure to include related services recommendations in C.R.'s IEP was not cured by references in other DOE documents. The IHO also concluded that the IEP's related services goals were developed without due consideration of the student's performance levels and without sufficient input from the parent and the Cooke Center. (JA 36–38.) It also determined that the recommendation that C.R. be placed at a 12:1:1 community school was contrary to the evidence and implemented without sufficient regard to the parent's and doctor's concerns. (JA 38.) Finally, the IHO found that the failure to include related services in the IEP and the lack of support for the 12:1:1 recommended placement impeded the parent's opportunity

to meaningfully participate in the IEP process. (JA 39.)

Having concluded that DOE failed to provide a FAPE, the IHO next turned to the Cooke Center program to determine its appropriateness and whether the equities favored K.C.'s reimbursement. The IHO found that the Cooke Center's small class setting, low student to staff ratio, and groupings of students with similar issues adequately met C.R.'s needs and allowed him to progress. (JA 40.) The IHO further found that K.C. had cooperated with DOE, and that the equities supported an order for full reimbursement. (JA 43.)

3. SRO Opinion

On October 10, 2013, the SRO issued its opinion reversing the IHO, concluding that DOE had offered C.R. a FAPE for his 2012–2013 school year, and denying reimbursement. (JA 20.) At the outset, the SRO found that the IHO had exceeded her jurisdiction by *sua sponte* considering allegations that did not appear in the Due Process Complaint, including: (1) whether the related service goals were developed based on the student's present levels of performance, and (2) whether the CSE insufficiently evaluated C.R. before recommending his IEP. (JA 8–10.)

The SRO determined that the absence of a Cooke Center representative from the CSE meeting did not impede the parent's opportunity to participate in the decisionmaking process and, therefore, did not result in a procedural denial of a FAPE. (JA 11–12.) Moreover, the SRO found that K.C. offered her opinion during the CSE meeting on several subjects and that neither she nor her attorney requested that the meeting be adjourned so that a Cooke Center representative could appear. (*Id.*)

The SRO also concluded that the IEP was substantively adequate to secure a FAPE, finding that (1) the 12:1:1 special class placement took into account C.R.'s academic and sensory needs, and (2) the DOE recommendation was consistent with K.C.'s assertion that C.R. required a "self-contained classroom that ha[d] clear, consistent routines and expectations." (JA 12–14.) With respect to the IEP's failure to include recommendations for related services, the SRO relied on Mr. Townsend's testimony that the CSE team had finalized the related services recommendation during the CSE meeting, and that the recommendation's omission from the IEP was a mere clerical error; the SRO also concluded that the law did not prevent it from considering Mr. Townsend's testimony. (JA 15–16.) Accordingly, the SRO held that the omission of related services from C.R.'s IEP did not result in a denial of a FAPE. (*Id.*)

Finally, given that K.C. had not enrolled C.R. at the P.S. 129 Center location, the SRO reviewed the IEP on its face. (JA 59–61.) Upon this inquiry, the SRO found that K.C.'s claims regarding the classroom composition, behavioral systems, and lack of technological resources were speculative and did not amount to a violation. (JA 16–19.) Accordingly, the SRO concluded that DOE had provided C.R. a FAPE and denied reimbursement without proceeding through the later steps of the IHO's analysis. (JA 19.)

### C. Procedural History

On February 10, 2014, Plaintiff filed a complaint seeking review of the SRO's decision. (Doc. No. 2.) She moved for summary judgment on May 2, 2014. (Doc. No. 15.) On June 13, 2014, Defendants cross-moved for summary judgment, arguing that the SRO correctly denied Plaintiff reimbursement. (Doc. No. 19.) The motions were fully submitted as of August 7, 2014. (Doc. No. 26.)

## II. STANDARD OF REVIEW

IDEA actions in federal court are frequently resolved on summary judgment motions. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Unlike a typical motion for summary judgment, however, in an IDEA action, the existence of a disputed issue of fact will not defeat the motion. *P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 382 (S.D.N.Y. 2008). Rather, the district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal citation and quotation marks omitted).

"The standard by which a district court reviews the final determination of the SRO has been characterized as modified *de novo* review." *Student X v. New York City Dep't of Educ.*, No. 07-cv-2316 (NGG), 2008 WL 4890440, at *3 (E.D.N.Y. Oct. 30, 2008) (internal citation and quotation marks omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206). "Thus, district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *A.C.*, 553 F.3d at 171 (quoting *Rowley*, 458 U.S. at 206).

In cases where the SRO's decision conflicts with the earlier decision of the IHO, "the IHO's decision 'may be afforded diminished weight.'" *A.C.*, 553 F.3d at 171 (quoting *Gagliardo*, 489 F.3d at 113 n.2). A district court must "'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'" *Id.* (quoting *Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)). Deference is "particularly appropriate" where the state officer's "review has been thorough and careful." *Walczak*, 142 F.3d at 129.

## III. DISCUSSION

"Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07). The Court will address each in turn.

### A. Procedural Review

"The initial procedural inquiry in an IDEA case is no mere formality, as adequate

compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (internal citation and quotation marks omitted). However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Procedural errors will render an IEP inadequate only where they have "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Here, K.C. argues that the August 23, 2012 IEP was procedurally deficient because the absence of a Cooke Center representative at the CSE impeded her ability to participate in the decisionmaking process. (Pl. Mem. 24.) She further alleges that the IEP's failure to list related services in their designated space denied C.R. a FAPE. (*Id.* 20–23.) As discussed below, the Court finds that neither of these alleged deficiencies, whether considered individually or collectively, significantly impeded K.C.'s ability to participate in the decisionmaking process or otherwise deprived C.R. of a FAPE.

1. Absence of a Cooke Center Representative

State regulations provide that "not less than one special education teacher of the student, or, if appropriate, not less than one special education provider of the student" shall attend the CSE meeting. 8 N.Y.C.R.R. § 200.3(a)(1)(iii). Accordingly, DOE committed procedural error by holding the CSE meeting without a Cooke Center representative. It does not follow, however, that this procedural violation necessarily impeded K.C.'s ability to participate in the CSE process and denied C.R. a FAPE. (*See* Pl. Mem. 24); *Grim*, 346 F.3d at 381.

In fact, a teacher's absence will not deprive the student of a FAPE where the school provides written input to guide the CSE team. *S.H. v. Eastchester Union Free Sch. Dist.*, No. 10-cv-03927 (KMW), 2011 WL 6108523, at *7 (S.D.N.Y. Dec. 8, 2011). Here, the Cooke Center submitted to the CSE a detailed progress report that described C.R.'s functional levels and educational needs. (JA 195, 557–576.) The report spanned twenty pages and included detailed teacher narratives and recommendations. Moreover, Mr. Townsend testified that K.C. stated she was "comfortable" with the content of the Cooke Center report and believed it to be accurate. (JA 155.)

K.C. attended the CSE meeting with her attorney and actively participated in the group discussion. Indeed, the CSE team asked K.C. for her views on multiple issues, she offered input, and her comments appear in the IEP itself. (JA 199, 334, 743.) For example, she advocated for a small, specialized class within a small school; the IEP even repeats her comment that a previous public placement had been "too large" for C.R. and that he was "sensitive to loud noise." (JA 743; *see also* JA 202–03.) Although K.C. deferred to the opinion of the Cooke Center educators, the written report crafted by C.R.'s instructors provided sufficient detail to inform and advise the

8

CSE team of the Cooke Center's position. (JA 176–78, 334.) Importantly, neither K.C. nor her lawyer requested that the meeting be delayed until a representative from the Cooke Center became available, despite notice that they could postpone the CSE meeting until K.C. and "individuals who have knowledge or special experience regarding [the] child" were able to attend. (JA 334, 725.)

Accordingly, the fact that no one from the Cooke Center was physically present at the CSE meeting did not fatally undermine the IEP process. The IDEA's procedural requirements mandate only the opportunity to participate, "not that the parent [or their representative] have the final word." *A.M. v. New York City Dep't of Educ.*, 964 F. Supp. 2d 270, 280 (S.D.N.Y. 2013).

### 2. Related Services

"Related services" under the IDEA include, *inter alia*, "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical [] occupational therapy, [and] counseling services . . . ) as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

K.C. claims that the 2012–2013 IEP was deficient because it omitted necessary related service recommendations. (Pl. Mem. 20.) She argues that the SRO's decision to the contrary was incorrect, since it was based on materials not included in the IEP. (Pl. Mem. 21–23.) She further submits that DOE cannot rehabilitate the IEP through hearing testimony or internal DOE documents describing service recommendations omitted from their designated section of C.R.'s IEP. (*Id.*)

As an initial matter, DOE agrees that it erred by omitting the CSE team's related service recommendations from the "Special Education Program/Services" chart in C.R.'s 2012–2013 IEP. (Def. Mem. at 21; JA 741); *see generally* 20 U.S.C. § 1414(d)(1)(A)(i)(IV) (requiring a "statement of the special education and related services" in the IEP). Nonetheless, DOE contends that the inadvertent omission of a related services program from the designated section of a child's IEP does not condemn the program recommended by DOE. (Def. Mem. 21.)

Here, the record reflects that K.C. was informed of C.R.'s related services recommendation during the CSE meeting. Mr. Townsend testified that the CSE team had discussed, and ultimately recommended, continuing the prior year's related services program as set forth in the Cooke Center progress report. (JA 162–63 (noting the CSE team discussion), 557 (listing occupational therapy once a week for thirty minutes individually ("1x30x1") and once a week for thirty minutes in a group of four ("1x30x4"), speech and language therapy once a week for thirty minutes individually ("1x30x1") and once a week for thirty minutes in a group of two ("1x30x2"), and counseling once a week for thirty minutes in a group of three ("1x30x3")).) In fact, neither K.C. nor her attorney, both present at the CSE meeting, objected to the recommendation that C.R.'s pre-existing related services plan be extended into the 2012–2013 school year. (JA 167–68.)

Several documents summarizing the CSE team discussion corroborate Mr. Townsend's testimony that DOE recommended providing C.R. with related services consistent with the Cooke Center report. First, DOE's review agenda, drafted prior to the CSE meeting, includes a planned related services discussion. (JA 729.) Second, Mr. Townsend's own handwritten notes and the official meeting minutes drafted by the DOE psychologist confirm that the related services discussion occurred during the meeting. (Townsend Notes; Meeting Minutes.) Finally, the conference result form, submitted at the conclusion of the CSE meeting, reiterated the related services recommendation as it appeared in the Cooke Center report and indicated that the team had decided during the meeting to extend those services into the 2012–2013 school year. (JA 732.)

The Final Notice of Recommendation sent to K.C. on August 28, 2012 – prior to her unilateral placement decision – further assured K.C. that her son's IEP plan included related services in "Occupational Therapy, Speech, [and] Counseling." (JA 618.)

Courts in this district have previously acknowledged that a failure to include a related services mandate in the properly designated space does not render an IEP plan inadequate where, as here, "counseling [was] discussed in other areas of the IEP" and plaintiffs "implicitly acknowledged that there was no dispute as to the level of counseling services recommended by the CSE by their conduct." *M.H. v. New York City Dep't of Educ.*, No. 10-cv-1042 (RJH), 2011 WL 609880, at *11 (S.D.N.Y. Feb. 16, 2011) (internal quotation marks omitted). In *M.H.* the Court found that it would "'exalt form over substance' to hold that the IEP plan was inappropriate simply because a recommendation, though known to the parties, failed to appear 'within the four corners of the IEP.'" *Id.* (citations omitted) (quoting *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990)).

Plaintiff claims that Mr. Townsend's testimony regarding the CSE meeting discussion is inappropriate following the Second Circuit's recent holding in *R.E. v. New York City Department of Education* and, therefore, cannot provide the corroborating evidence necessary to excuse a recommendation otherwise absent from C.R.'s IEP. (Pl. Br. 22–23); 694 F.3d 167 (2d Cir. 2012). The Court disagrees. In *R.E.*, the court found that "the use of retrospective testimony . . . may not be used to materially alter a deficient written IEP by establishing that the student would have received services beyond those listed in the IEP." *Id.* at 174. This rule, however, does not preclude testimony regarding the conversation at the August 2012 CSE team meeting. Here, as in *M.H.*, Mr. Townsend's testimony and DOE documents regarding C.R.'s related services do not constitute retrospective evidence as to what DOE would have done to accommodate a student's needs; rather, it clarifies what actually transpired at the meeting and reflects the parties' original understanding of the scope of C.R.'s IEP plan.

Moreover, *R.E.* does not prohibit even retrospective evidence offered to "explain or justify" services identified within a child's IEP. 694 F.3d at 185. Here, for example, the IEP assumed that C.R.'s related service program would continue in the upcoming school year, and the document devoted entire sections to "Speech Therapy,"

10

"Counseling," and "Occupational Therapy" goals and metrics. (JA 738–39.) Clearly, the inclusion of provisions designed to measure progress in related services activities would be nonsensical if the IEP did not encompass these services.

The underlying logic of *R.E.*'s retrospective evidence rule aims to protect parents who must decide between a public placement and unilateral private enrollment with only the IEP to guide their selection. *R.E.*, 694 F.3d at 186. This concern is not implicated where a parent is on notice that related services will be made available to the student in precisely the manner requested by the parent and the child's current school. Here, the discussion at the CSE meeting, C.R.'s IEP itself, and C.R.'s Final Notice of Recommendation each alerted K.C. that her son would receive related services of the very type, frequency, and duration deemed appropriate by the Cooke Center.

Upon a full review of the record, the Court finds that defects in C.R.'s IEP did not cumulatively "impede[] the child's right to a [FAPE], significantly impede[] the parents' opportunity to participate in the decisionmaking process, or cause[] a deprivation of educational benefits." *R.E.*, 694 F.3d at 190 (alteration in original) (internal quotation marks omitted).

B. Substantive Review

The IDEA requires school districts to provide each disabled student with an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. The IDEA does not require the school district to "'maximize the potential of handicapped children.'" *Walczak*, 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 199). Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal citation and quotation marks omitted). The statute requires an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989) (citations omitted)).

K.C. argues that the IEP and P.S. 129 Center placement were substantively inadequate to provide C.R. with a FAPE. Specifically, she asserts that (1) the 12:1:1 program recommendation included in the IEP did not address C.R.'s academic and emotional needs, and (2) DOE failed to show that it could implement C.R.'s IEP at the recommended placement. (Pl. Mem. 24–27.) The Court will address each of these arguments in turn.

1. The 12:1:1 Program Recommendation

K.C. maintains that DOE's 12:1:1 program recommendation

> completely ignored (1) the fact that C.R. regressed severely the last time he was in a 12:1:1 classroom; (2) the ample evidence adduced at the hearing that C.R. does not do well in noisy environments, (3) Dr. Whitaker's testimony that C.R. should be in a small structured classroom with a high teacher to student ratio;

and (4) C.R.'s teacher's testimony regarding the fragile progress C.R. ha[d] made even with 12:[1:]4 instruction.

(Pl. Mem. 24.)

The 12:1:1 program recommendation is designed for students "whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students." 8 N.Y.C.R.R. § 200.6(h)(4)(i). Though Dr. Whitaker and C.R.'s Cooke Center teacher urged a contrary result, the record demonstrates that the CSE team relied on its expertise and the documentary record in recommending a 12:1:1 classroom placement for C.R.

The IHO Hearing testimony reflects the CSE team's detailed review of C.R.'s academic, social, and physical progress as reflected in the prior year's IEP and the Cooke Center report. (See JA 153.) These documents indicated that C.R. required adult support but that he could also function independently for short periods of time. (See JA 733 (noting C.R.'s ability to read silently for 10–20 minutes).) At this level of functionality, Mr. Townsend, an educator with substantial experience, believed that a 12:1:1 program was the proper placement. (JA 179, 199.) Moreover, Mr. Townsend testified that a 12:1:1 class met K.C.'s description of the ideal environment for C.R.: a "self-contained classroom that has clear, consistent routines and expectations." (JA 178, 179.) Though the team had considered recommending a 12:1:1 program in a special education school environment isolated from general education students, it decided that such a recommendation would result in a placement decision too restrictive for C.R.'s needs. (JA 743.)

K.C. alleges that the CSE team did not sufficiently regard C.R.'s prior experience with regression and excessive noise in community school when it recommended a 12:1:1 program in a community school facility. However, there is nothing in the record to suggest that the CSE team disregarded that experience. Moreover, C.R.'s prior experience in a public school setting occurred years before, when C.R. was in kindergarten. Given the passage of time and C.R.'s subsequent development, the CSE team could reasonably expect that C.R.'s difficulties as a kindergartener would not necessarily be replicated in his fourth-grade year. In fact, the IEP's recommendation that C.R. maintain a quiet and structured environment was specifically designed to address K.C.'s fears. (JA 179 (noting that the 12:1:1 recommendation provided a self-contained environment).) Additionally, the CSE team tailored C.R.'s IEP recommendation to ensure that he received additional support to prevent regression. (JA 734–35 (identifying "management needs" including: graphic organizers; positive reinforcement; simple, clear directions; small group instruction; a multisensory approach; manipulatives; direct teacher modeling; rephrasing and repeating directions as needed; and verbal and auditory cues).) Under these circumstances, "it is not for the federal court to choose between the views of conflicting experts." See R.E., 694 F.3d at 189. Consequently, the Court cannot say that the 12:1:1 program selection was unlikely to produce progress such that the IEP was substantively inadequate.

### 2. Placement at P.S. 129 Center

K.C. next claims that DOE failed to establish that P.S. 129 Center could implement the requirements of C.R.'s IEP. (Pl. Mem. 25.) Specifically, K.C. contends that facts regarding the P.S. 129 Center are not "speculative" and, in fact, demonstrate that DOE could not provide C.R. a FAPE for the 2012–2013 school year. (Pl. Mem. 25–27).

The Second Circuit has clearly held that, where a child never enrolls in the public placement, the adequacy of DOE's offered placement must be determined on the face of the IEP. *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 187 (2d Cir. 2012) ("In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan."). Accordingly "[s]peculation that a school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *Id.* at 195

While a school district does not have "carte blanche" to assign a placement "that cannot satisfy the IEP's requirements," *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009), district courts disagree over their proper role in evaluating a proposed placement. *See S.W. v. New York Dep't of Educ.*, No. 14-cv-1754 (SHS), 2015 WL 1097368, at *14–15 (S.D.N.Y. Mar. 12, 2015). Some read the proscription on retrospective evidence broadly to exclude all challenges to an unattended placement. *See, e.g.*, *B.P. v. New York City Dep't of Educ.*, No. 14-cv-1822 (LGS), 2014 WL 6808130, at *12 (S.D.N.Y. Dec. 3, 2014) (finding that a "challenge to the district's choice of school is improper where the student never attended the school"). Others permit evidence regarding DOE's proposed placement to defeat a FAPE only where the placement was either "factually incapable" of implementing the student's IEP or the placement reflected "plans to contravene the IEP." *See, e.g.*, *D.C. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 510–12 (S.D.N.Y. 2013) (finding a substantive denial of a FAPE where the IEP required a seafood-free environment and a school administrator informed parents that the site was not then, and would not later become, seafood-free); *Scott v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 444–45 (S.D.N.Y. 2014) (finding a substantive denial of a FAPE where the IEP required a 12:1:1 program and a school administrator informed parents that there was no availability in a 12:1:1 class for the upcoming school year). Here, the Court need not decide among these conflicting standards, since K.C.'s allegations do not undermine the adequacy of the P.S. 129 Center placement under either approach.

Since the Court finds that the IEP was not inadequate on its face, "[p]laintiff[] bear[s] the burden of proof on prospective challenges to the adequacy of a proposed placement." *S.W.*, 2015 WL 1097368, at *15 n.9. Here, both K.C. and Ms. Tuttle testified regarding the P.S. 129 Center at the IHO Hearing. They expressed several concerns upon observing P.S. 129 Center's sole 12:1:1 class for C.R.'s age group, including that (1) one of the students was emotionally disturbed, (2) sensory modifications necessary to avoid sudden lights or sounds that might affect C.R. were not required in the classroom, and (3) the school was large and loud. (JA 232–34 338–40.) But Plaintiff does not establish that the emotionally disturbed student would remain in the fourth-to-sixth-grade 12:1:1

class the following year, explain how this student would prevent C.R. from progressing, or clarify why P.S. 129 Center's behavioral modification program would fail to regulate the child's behavior. (Pl. Mem. 25–27; JA 232–33.) Further, K.C. does not allege that P.S. 129 Center would have failed to implement sensory modification programs once C.R. enrolled, only that those programs were not "necessary" for the students then enrolled in the class that K.C. and Ms. Tuttle observed during their site visit. (JA 233.) Finally, noise in the hallway, observed on a single occasion, cannot establish that the P.S. 129 Center environment was generally noisy or that the noise level there would have caused C.R. to regress. Indeed, courts in this district require substantially more to establish that a placement in which the child never enrolled was substantively inadequate. *See, e.g., N.S. v. New York City Dep't of Educ.*, No. 13-cv-7819 (VEC), 2014 WL 2722967, at *14 (S.D.N.Y. June 16, 2014) (refusing to label a school generally unsafe on the basis of a single altercation witnessed during the parent's visit because "[i]f one altercation renders a school unsafe, the Court suspects that every public school in New York – or at least the vast majority of them – would have to be deemed 'unsafe'"); *Scott*, 6 F. Supp. 3d at 445. To conclude that P.S. 129 Center would fail to provide a FAPE under these circumstances would be to engage in "[s]peculation" and is "not an appropriate basis" to assess the placement; a "suggestion that some students are underserved cannot overcome the 'particularly important' deference that we afford the SRO's assessment of the plan's substantive adequacy." *R.E.*, 694 F.3d at 195 (2d Cir. 2012).

Thus, upon a full review of the record, the Court must agree with the SRO's thorough analysis and find that DOE provided C.R. with an IEP "reasonably calculated to enable the child to receive educational benefits" for his fourth-grade year. *Rowley*, 458 U.S. at 207.

C. Scope of IHO Review

Finally, K.C. alleges that the SRO erred when it found that the IHO exceeded her jurisdiction in deciding two of K.C.'s claims. (Pl. Mem. 27–28.) Specifically, she alleges that the IHO correctly addressed (1) whether the CSE team based C.R.'s related service goals on outdated accounts of his performance levels, and (2) whether the CSE considered insufficient data evaluating C.R. prior to recommending his IEP. (*Id.*; *see also* JA 8–10.) Accordingly, K.C. submits, these arguments are properly before the Court. (Pl. Mem. 27–28.)

Although its provisions are not "mechanically applied," the IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process] notice." 20 U.S.C. § 1415(f)(3)(B). Within the Second Circuit, the appropriate scope of review is "limited to matters either raised in the plaintiff['s Due Process Complaint] or agreed to by [the d]efendant." *E.F. v. New York City Dep't of Educ.*, No. 12-cv-2117 (MKB), 2013 WL 4495676, at *17 (E.D.N.Y. Aug. 19, 2013).

K.C. argues that the Due Process Complaint's allegations that the IEP "was the result of a flawed process" and "insufficiently designed to appropriately address [C.R.'s] academic needs" were

14

enough to raise the additional arguments addressed by the IHO. (JA 642.) But even liberally construed, these broad assertions – the first a general allegation of procedural inadequacy and the second asserting that the overall IEP was substantively improper – did not provide DOE "fair notice" that K.C. intended to allege specific defects in the timing and depth of the evaluative materials considered by the CSE team in developing C.R.'s IEP. (JA 641–44.) *See C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 224 (S.D.N.Y. 2014) (noting that vague statements in a complaint cannot put DOE on adequate notice of additional, independent challenges); *Scott*, 6 F. Supp. 3d at 438 (finding the parent's "broad allegation" that her child's "IEP was 'not based on adequate evaluations'" did not sufficiently raise the "subsidiary issue" of the CSE's failure to consider a particular set of evaluative reports and noting that to hold otherwise would result in "unfair sandbagging of the DOE").

Accordingly, the Court agrees with the SRO and concludes that the IHO's additional findings were based on allegations not properly presented in K.C.'s Due Process Complaint. Therefore, the Court lacks jurisdiction to address them now. *See Cave v. East Meadow Union Free School Dist.*, 514 F.3d 240, 245–46 (requiring proper administrative exhaustion of IDEA claims to establish subject matter jurisdiction in the district court).

### D. Reimbursement Inquiry

The parties make further arguments as to whether C.R.'s placement at the Cooke Center met his educational needs and whether the equities support K.C.'s claim for reimbursement. Because the Court finds that DOE provided C.R. with an IEP that both "complied with the procedural requirements of the IDEA" and was "'reasonably calculated to enable the child to receive educational benefits'" for the 2012–2013 school year, *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07), the Court does not reach the further hurdles that stand between Plaintiff and reimbursement. *See generally D.B. v. New York City Dep't of Educ.*, No. 10-cv-6183 (RWS), 2011 WL 4916435, at *12 (S.D.N.Y. Oct. 12, 2011) (finding that a reviewing court need not reach the final factors of reimbursement analysis where it finds an IEP procedurally and substantively adequate).

### IV. CONCLUSION

The Court recognizes that K.C. aims to provide her son with the best possible education and the most promising opportunities to meet the challenges of his condition. Nevertheless, the IDEA does not require deference to parents' interests, however well-intentioned, and limits the inquiry to be made by the courts. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal citation and quotation marks omitted). That may be a modest goal, and one that falls far short of what K.C. hopes to provide for her child. But that is all that the law requires, and after a careful and painstaking review of the record before it, the Court finds that DOE has met that standard here.

For the reasons stated above, the Court finds that (1) DOE complied with the procedural requirements of the IDEA, and (2) the August 2012 IEP was reasonably calculated to enable C.R. to receive educational benefits. Accordingly, Defendant's cross-motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 15 and 19, and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2015
       New York, New York

\*   \*   \*

Plaintiffs K.C. and C.R. are represented by Sander Bak, Jay D. Grushkin, Nicole Vasquez Schmitt, Nicole Doppelt, John McManmon, and Jessica Marczyszak, of the Law Offices of Milbank, Tweed, Hadley & McCloy, LLP, 1 Chase Manhattan Plaza, New York, New York 10005-1413.

Defendant The New York City Department of Education is represented by Neil Giovanatti of New York City Law Department, 100 Church Street, Room 2663, New York, New York 10007.